IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 5, 2022

**MICHAEL BLAND v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 12-05597          James M. Lammey, Jr., Judge**

_____

**No. W2021-00897-CCA-R3-ECN**
_____

In 2015, a Shelby County jury convicted the Petitioner, Michael Bland, of first degree premeditated murder, and the trial court imposed a life sentence. On February 20, 2020, the Petitioner filed a petition for a writ of error *coram nobis*, alleging that newly discovered evidence exists. After a hearing on the petition, the *coram nobis* court issued an order denying the petition. The Petitioner appeals, arguing that the *coram nobis* court erred by denying relief. The Petitioner asserts that newly discovered evidence would have changed the outcome of the trial. After review, we affirm the *coram nobis* court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., join.

Jason M. Matthews, Memphis, Tennessee, for the appellant, Michael Bland.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Greg Gilbert, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

A Shelby County grand jury indicted the Petitioner for the first degree premeditated murder of H.T. Alston. On appeal from the denial of post-conviction relief, this court summarized the facts presented at trial as follows:

Prior to his murder, the victim allegedly robbed Petitioner during a dice game. On July 12, 2012, Petitioner and his brother, David Bland,

armed themselves after Petitioner spotted the victim upon the victim's return to his residence. Petitioner and David Bland were with Christopher Williams at the time. Mr. Williams claimed that Petitioner planned to shoot the victim in the legs and rob him. Mr. Williams recalled that he and David Bland remained on a side street while Petitioner waited for the victim in a concealed spot. When the victim approached, Petitioner fired at him multiple times.

Decorrio Morgan, a neighbor, heard a gunshot and saw Petitioner and another man standing over the victim. Mr. Morgan initially stated that he observed Petitioner shoot the victim. In a statement to prosecutors, he stated that it was Mr. Williams who shot the victim, but at trial he was certain that Petitioner shot the victim. Rosie Mae Fason lived in the area and testified that she heard gunshots and saw two African American men run through the alley. Francie Hunt, another neighbor, testified that she passed Petitioner, Mr. Williams, and another man. Ms. Hunt testified that the men were carrying guns and that she heard Petitioner state, "I shot that bitch." Jessica Bland, Petitioner's sister, testified that she drove Petitioner to another sister's house on the day of the shooting. Ms. Bland admitted that her testimony at trial differed from her pretrial statements to police. She admitted that she told police that she was aware that the victim robbed her brothers during a dice game. Ms. Bland informed police that after the robbery, Petitioner stated that he was going to "beat that boy."

*Michael Bland v. State*, No. W2020-00454-CCA-R3-PC, 2021 WL 274769, at *1 (Tenn. Crim. App. Jan. 26, 2021), *no perm. app. filed* (citations omitted).

The jury convicted the Petitioner of first degree premeditated murder, and the trial court imposed a life sentence. This court affirmed the Petitioner's conviction on appeal. *State v. Michael Bland*, No. W2014-00991-CCA-R3-CD, 2015 WL3793697 at *1 (Tenn. Crim. App. June 16, 2015), *perm. app. denied* (Tenn. Oct. 15, 2015). The Petitioner unsuccessfully sought post-conviction relief based upon ineffective assistance of counsel. *Michael Bland v. State*, 2021 WL 274769, at *1.

On February 20, 2020, the Petitioner filed a petition for writ of error *coram nobis*, alleging newly discovered evidence. In support, he attached a summary of an October 28, 2016 police interview with Christopher Williams and an undated hand-written letter from Mr. Williams. The police interview was at Mr. Williams's request and addressed numerous other crimes, most of which the police were unable to verify. The portion relevant to the Petitioner's appeal reads as follows:

2

Williams claimed to have killed HT Austin [sic] on July 12, 2012. This case was researched and [the Petitioner] was convicted of that crime and Williams was a witness in that case. Williams went on to say that we should let [the Petitioner] out of jail since he was the one that did it. (NOTE: This case was also researched by Sgt. Kelly and Lt. A Mullins #5592 as we discussed this and all of the witnesses identified [the Petitioner], who does NOT look similar to [Williams], with the biggest difference being that [the Petitioner] had a low haircut at the time and Williams had shoulder length dreads.)

The undated hand-written letter signed by Mr. Williams, stated that the reason Mr. Williams testified against the Petitioner at trial was due to statements, he believed were made by the Petitioner, shown to him following his arrest for robbery. Upon learning from one of the Petitioner's cellmates that the Petitioner had not made those statements, Mr. Williams expressed a willingness to speak with the Petitioner's attorney. He wrote "I love yo bra and I'ma do everything I can to help you get out."

The *coram nobis* court held a hearing where two witnesses were called. The first, Mr. Williams, invoked his Fifth Amendment right to remain silent. The other witness was Memphis Police Department Sergeant Eric Kelly. Sergeant Kelly conducted the October 28, 2016 police statement with Mr. Williams. During the interview, Mr. Williams confessed to four different homicides, one of which was the homicide in this case. Mr. Williams claimed that he, not the Petitioner, fatally shot the victim with a .45 caliber gun. Police were unable to verify much of Mr. Williams's statement, which involved four homicides, five or six shootings, and robberies.

Sergeant Kelly recalled that Mr. Williams was present at the time of the victim's murder in this case and that Mr. Williams had subsequently identified the Petitioner in a photographic lineup. During the 2016 interview with Sergeant Kelly, Mr. Williams initially stated that he implicated the Petitioner because they had "got into it about something." When the police questioned that Mr. Williams had gotten into a fight with the Petitioner during the short period between the shooting and the Petitioner's arrest, Mr. Williams changed his story. He stated that he implicated the Petitioner in the shooting because he had thought the Petitioner "was going to snitch on [him]." Sergeant Kelly believed Mr. Williams's recantation of his trial testimony to be false. He noted that the details of the crime Mr. Williams provided would have been known to him as a witness to the crime and also that other State witnesses had identified the Petitioner as the shooter.

Mr. Williams was charged and convicted (February 14, 2019) for one of the homicides he confessed to during the 2016 interview. Sergeant Kelly explained that

often when a defendant realizes they are "going to jail for a long time," they attempt to help other inmates by confessing to other crimes. Mr. Williams admitted to communicating with the Petitioner before Mr. Williams was taken into custody on the unrelated 2019 murder conviction. Police investigation following the 2016 interview indicated that the majority of offenses for which Mr. Williams confessed, he had not committed.

In a subsequent order, the *coram nobis* court made the following findings:

Applying the law to the facts of the present case, Petitioner fails to satisfy the requirements necessary to obtain relief through issuance of writ of error coram nobis. This Court does not find that the new evidence presented may have resulted in a different result at trial for the following reasons:

First, the testimony given by Mr. Williams was under oath, and the statement given to police officers was not. Because of this, this Court gives deference to the testimony given under oath. Testimony given under oath is presumed to be truthful or at least given under good faith. The statement given to police officers is not presumed to be truthful because it was not given under oath. Furthermore, his trial testimony was corroborated.

Second, the jury at the original trial was given an instruction that Mr. Williams may be an accomplice, and because of this the jury had already considered whether Mr. Williams was actively involved.

Third, [the Petitioner] was seen, by independent witnesses, at the crime scene, holding a gun, and shooting at the victim. The jury was instructed that they were to determine whether [the Petitioner], **or one for whom he is criminally responsible** committed this homicide. Had Mr. Williams given his confession before the trial, Mr. Williams most assuredly would have been indicted as a co-defendant and [the Petitioner] would have been convicted without Williams' testimony. It is also doubtful Mr. Williams' statement would have been admissible.

Fourth, Mr. Williams pled the Fifth and refused to testify at the Error Coram Nobis hearing, and because of this it is logical that he would have refused to testify at the trial as well. Under criminal responsibility for the actions of another, who the shooter was would have been irrelevant. Incidentally, because the jury was instructed that Mr. Williams may be an accomplice and that the [Petitioner], or one for whom he is responsible, could be found guilty of murder first degree, coupled with the facts of the

4

case and the defense offered at trial there is a good argument that the evidence offered may not in fact be new. The jury considered Mr. Williams may have been the shooter as he was properly identified to the jury as possibly an accomplice.

Fifth, there were three other witnesses at the original trial that testified that the Petitioner was the one who was the shooter or was responsible for the victim's death. One of the witnesses, **Decorrio Morgan**, who was a neighborhood resident and friend of the victim, testified at the original trial that he was walking to the "College Park." When he was about halfway down the street, he heard a gunshot. When he turned around he saw the Petitioner and a second man standing over the victim. Mr. Morgan testified that the Petitioner had a gun in his hand, and he saw the Petitioner shooting the victim. Mr. Morgan further testified that he identified the Petitioner as the shooter in the photographic array, and that Petitioner was the only one he saw with a gun that day.

The second witness, **Rosie Mae Fason**, who was the victim's aunt, also testified at the original trial. She testified that she was standing outside the door to her house, located near Orleans and Williams, when she heard gunshots and reacted by running inside and "hitting the floor." When the shooting stopped, she got up, looked out the door, and saw two African-American men running through the alley. She further testified that one of the men was wearing a yellow shirt and carrying a black gun, and the other was wearing a white shirt.

The third witness, **Francie Hunt**, who was a neighborhood resident, also testified at the original trial. She testified that on the day of the incident, she was walking home from her godfather's house on Williams Street when the victim stopped her to ask for a light. Afterward, she was continuing on her way through the "cut" when she passed by the Petitioner, Mr. Williams, and "Day- Day" who were armed with guns. She was familiar with the men, and when she saw them with the guns, she knew what was going on. She testified that when she got to the door of her house, she heard three or four gunshots, and turned around and saw the same three men running back carrying their guns, and overheard the Petitioner say, "we got that b****." All three witnesses testified at the original trial, under oath, and, therefore, all three witness's testimony are considered true and made in good faith.

Lastly, the trial judge must first consider the recanted testimony and be reasonably well satisfied with its veracity. *Vasques*, 221 S.W.3d at 527. Furthermore, the assessment of witness credibility is left to the sound discretion of the lower court. *Id*. Here, this Court is not reasonably satisfied that the original testimony was false and that the new confessions were true; quite the contrary. This Court bases its decision on the fact that most of the statements Mr. Williams made to the police cannot be corroborated. Mr. Williams had confessed to multiple other homicides when he talked to the detectives. Lieutenant Kelly testified as to how Mr. Williams would have been about 11 or 12 for the some of the homicides that he had confessed to, and how some of the homicides could not be verified no matter how hard detectives tried. Therefore, the veracity of Mr. Williams' statement is doubtful. It was not possible to corroborate any of the crimes he had confessed to except for the one to which Mr. Williams was accused, and subsequently convicted for.

We don't know the motive for Mr. Williams to admit to other homicides that could not be corroborated while confessing to the homicide to which he was subsequently convicted. He invoked the Fifth Amendment when given the opportunity to testify at the error coram nobis hearing. It seems likely his motive was to shed doubt on the veracity of his real confession.

It is for these reasons that this Court is not satisfied that this new evidence may have resulted in a different result at trial. To the contrary this Court is confident Petitioner would have been convicted even if Mr. Williams had not testified at all and his statement was somehow provided to the jury.

It is from this judgment that that the Petitioner appeals.

## II. Analysis

On appeal, the Petitioner contends that the trial court erred when it denied his petition for writ of error *coram nobis*. He asserts that Mr. Williams's testimony meets the standard for granting *coram nobis* relief based upon recanted testimony. The State counters that the *coram nobis* court correctly declined to grant the petition after expressing doubt about the veracity of the witness's testimony and finding that there was no reasonable basis to conclude that, had Mr. Williams's recanting of his testimony been presented, that the result of the proceedings would be different.

A writ of error *coram nobis* is available to a defendant in a criminal prosecution. T.C.A. 40-26-105(a) (2018). The decision to grant or to deny a petition for the writ of error *coram nobis* on its merits rests within the sound discretion of the trial court. *State v. Ricky Harris*, 301 S.W.3d 141, 144 (Tenn. 2010) (citing *State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007)). Tennessee Code Annotated section 40-26-105(b) provides, in pertinent part:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

A writ of error *coram nobis* is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn.1999); *State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002). As previously noted by this Court, "the purpose of this remedy 'is to bring to the attention of the [trial] court some fact unknown to the court, which if known would have resulted in a different judgment.'" *State v. Hart*, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995) (quoting *State ex rel. Carlson v. State*, 407 S.W.2d 165, 167 (Tenn. 1996)).

To establish that he is entitled to a writ of error *coram nobis*, the Petitioner must show: (a) the grounds and the nature of the newly discovered evidence; (b) why the admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial; (c) that the Petitioner was without fault in failing to present the newly discovered evidence at the appropriate time; and (d) the relief sought. *Hart*, 911 S.W.2d at 374-75. Affidavits should be filed in support of the petition. *Id*. at 375.

The grounds for seeking a petition for writ of error *coram nobis* are not limited to specific categories, as are the grounds for reopening a post-conviction petition. *Coram nobis* claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner also establishes that the petitioner was "without fault" in failing to present the evidence at the proper time. *Coram nobis* claims therefore are singularly fact-intensive. Unlike motions to reopen, *coram nobis* claims are not easily resolved on the face of the petition and often require a hearing. *Harris v. State*, 102 S.W.3d 587, 592-93 (Tenn. 2003).

The Petitioner's petition for *coram nobis* relief is based on a claim of recanted testimony. Recanted testimony may be considered newly discovered evidence under

7

certain circumstances. *See Mixon*, 983 S.W.2d at 672. This court has concluded that a trial court should only grant a writ of error *coram nobis* upon the basis of newly discovered recanted testimony if:

> (1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told.

*State v. Ratliff*, 71 S.W.3d 291, 298 (Tenn. Crim. App. 2001) (citing *Mixon*, 983 S.W.2d at 673 n.17).

Inherent in the determination of whether a petitioner is entitled to relief based upon recanted testimony is the *coram nobis* court's determination of whether the witness recanting his or her testimony is credible. A petitioner is not entitled to *coram nobis* relief based on recanted testimony unless the *coram nobis* court is reasonably satisfied that the prior testimony was false and the present testimony is true. *Ratliff*, 71 S.W.3d at 298.

In the case under submission, the trial court determined that Mr. Williams's recanting of his trial testimony was not credible. It noted that Mr. Williams's 2016 statements were uncorroborated; thus, the court credited Mr. Williams's trial testimony implicating the Petitioner. The court also noted that the jury was instructed that Mr. Williams may have been an accomplice, "and because of this the jury had already considered whether Mr. Williams was actively involved." The *coram nobis* court questioned whether the testimony would have been admitted at trial but concluded that it would not have changed the outcome.

In light of Mr. Williams's invocation of his right to remain silent at the *coram nobis* hearing, the trial court determined that it was likely Mr. Williams would not have elected to implicate himself under oath at trial. The *coram nobis* court was able to see and hear Mr. Williams's testimony at the trial and the testimony presented at the evidentiary hearing and was in the best position to evaluate his credibility. "[A]ppellate courts do not reassess credibility determinations." *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009). Additionally, there was other evidence, including three eyewitness accounts, inculpating the Petitioner in this murder. In our view, the *coram nobis* court based its conclusion on a reasonable assessment of the evidence, and the Petitioner is not entitled to relief.

8

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we conclude that the *coram nobis* court did not err when it denied the Petitioner's petition for writ of error *coram nobis*.

_____
ROBERT W. WEDEMEYER, JUDGE

9