IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 27, 2012

## CLARENCE D. SCHREANE v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 283882     Rebecca Stern, Judge**

**No. E2012-01202-CCA-R3-PC - Filed January 16, 2013**

In 2004, a Hamilton County jury convicted the Petitioner, Clarence D. Schreane, for committing first degree felony murder and especially aggravated robbery in 1991, and the trial court sentenced him to 60 years of incarceration. This Court affirmed his convictions and sentence on appeal. *State v. Clarence David Schreane, et al.,* No. E2005-00520-CCA-R3-CD, 2006 WL (Tenn. Crim. App., at Knoxville, Apr. 5, 2006), *perm. app. denied* (Tenn. Aug. 28, 2006). The Petitioner filed a petition for post-conviction relief, which the post-conviction court dismissed. We affirmed the dismissal on appeal. *Clarence David Schreane v. State*, No. E2009-01103-CCA-R3-PC, 2010 WL 3919264 (Tenn. Crim. App., at Knoxville, Oct. 7, 2010), *perm. app. denied* (Tenn. Jan. 18, 2011). Subsequently, the Petitioner filed a writ of error coram nobis, in which he alleged that the trial court erred when it admitted his statement to police during the trial because the trial court did not review the statement first, outside the presence of the jury. The coram nobis court dismissed the writ. After a thorough review of the record, the briefs, and relevant authorities, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR. and CAMILLE R. MCMULLEN, JJ., joined.

Clarence D. Schreane, Lewisburg, Pennsylvania, Pro Se.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; and William H. Cox, III, District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts

## A. Background and Direct Appeal

This case arises from a murder that occurred in 1991. A Hamilton County jury convicted the Petitioner of first degree felony murder and especially aggravated robbery. The Petitioner appealed to this Court, and we recited the following facts in our opinion disposing of his appeal:

This case relates to the [Petitioner's] participation in the killing of Marcus Edwards on September 19, 1991. The Chattanooga Police Department investigated the murder; however, the case went cold and remained unsolved for eight years. In 1999, the [Petitioner] was incarcerated on unrelated charges when he contacted Chattanooga Police Department detectives and told them he had information related to the unsolved 1991 murder. The detectives had the [Petitioner] brought to their location to speak with him, and after a period of a few hours, the [Petitioner] confessed.

At the trial, the evidence showed that the [Petitioner] accompanied Charles Turner to the victim's place of business to help Mr. Turner commit a robbery. As the victim was talking to Mr. Turner, the [Petitioner] struck the victim with a rock, and Mr. Turner then shot the victim with a .38 caliber handgun. Mr. Turner took the victim's .357 magnum handgun, which was on the victim's body. Mr. Turner also took a cigar box containing cash and gave the [Petitioner] one hundred dollars as both men fled the scene in the [Petitioner's] 1983 Cadillac Eldorado.

Before the trial, the [Petitioner] filed a motion to suppress his confession, arguing that it was taken in violation of his Fifth and Fourteenth Amendment rights. At the motion to suppress hearing, Chattanooga Police Department Detective Mike Mathis testified that he was the lead investigator for the 1991 murder. He said the victim was shot to death and found in his business. Detective Mathis said few solid leads developed until the [Petitioner] contacted them.

Detective Mathis said that sometime before September 19, 1999, Chattanooga Police Department Lieutenant Steve Angel had been receiving collect telephone calls from the Hamilton County Jail, which he was unable to answer. He said that the [Petitioner's] "significant other" contacted the detectives and told them the [Petitioner] wanted to talk to them about an unsolved murder. He said the [Petitioner] also called and spoke with Lt. Angel and told him enough specific information about the murder to cause Lt. Angel

-2-

to have the [Petitioner] transported from the Hamilton County Jail to the police service center.

Detective Mathis said he conducted an interview with the [Petitioner], culminating in a tape-recorded statement. He said that although the [Petitioner] was in custody on unrelated charges, he was not under arrest or charged with the victim's murder when he confessed. Detective Mathis said he did not promise the [Petitioner] anything in return for his confession. Detective Mathis said the [Petitioner] waived his constitutional right to remain silent and to an attorney before making the tape-recorded statement.

On cross-examination, Det. Mathis said he talked with the [Petitioner] for some period of time before reading him his Miranda rights. He admitted that before he arrived to interview the [Petitioner], Lt. Angel had been talking to the [Petitioner]. Detective Mathis said that although he did not promise the [Petitioner] anything specific in return for his confession, he did explain to the [Petitioner] that he would tell the district attorney general's office that the [Petitioner] had come forward on his own and cooperated with the police. Detective Mathis admitted that he may have told the [Petitioner] he would try to help transport the [Petitioner] from the Hamilton County Jail to Silverdale, a state correctional facility.

On redirect examination, Det. Mathis said the [Petitioner] initiated the contact with the police department. Detective Mathis explained that the reason for the delay in reading the [Petitioner] his Miranda rights was the [Petitioner] initially maintained that he had only heard about the murder, not that he had any involvement in it. He said the [Petitioner] ultimately "came clean" and confessed.

The [Petitioner] testified that when he first arrived at the police service center, he was placed in an interview room with Det. Carroll and Det. Mathis. He said Lt. Angel entered the room later. The [Petitioner] said Det. Mathis told him he believed "the bicycle bandit" was responsible for the victim's murder. The [Petitioner] said that he then asked to speak with his attorney but that Det. Mathis told him he did not need an attorney. The [Petitioner] said Det. Mathis made promises to him before the taping began. He said Det. Mathis promised him that the [Petitioner] would not be charged with the murder, that Det. Mathis would speak with the [Petitioner's] parole officer in another case, and that Det. Mathis would speak with the district attorney general's office in order to have them dismiss certain charges against the [Petitioner] from another case in return

for the [Petitioner's] cooperation. He said Det. Mathis also promised to transfer him from the Hamilton County Jail to Silverdale. The [Petitioner] said he was transferred to Silverdale two days later. The [Petitioner] said he did not sign the waiver form until after the taped statement was made.

After considering the evidence and the arguments of counsel, the trial court denied the [Petitioner's] motion to suppress. It stated:

> Even on your motion, I can base all of my findings on what Mathis and the statement says . . . . The initial contact came not from the police to [the Petitioner] but from someone on [the Petitioner's] behalf and then later by [the Petitioner] to the police. [The police] would have been derelict in their duty not to see what [the Petitioner] had to say about it, something like this. So they bring him out there and talk with him.

> Now, as far as the requirements for Miranda warnings, you have to be in custody and subject to interrogation. He was in custody but certainly not on this and not by these officers on this. So I don't think that it actually applies in this situation.

> The fact that he is in custody on something else doesn't mean for Miranda purposes he wasn't in custody on this.

> He also made the initial contact. Certainly they questioned him after he gave them some information but I find from the transcript itself and the conversation between Mr. Mathis at the very beginning of the tape, he says, "Prior to taking this statement I advised you of your constitutional rights and did you understand these." [The Petitioner] says, "Yes, he did."

> Mathis says, "Am I correct in saying that as I started to advise you of them, you basically recited them to me, did you not?" [The Petitioner] said, "Yes."

> Mathis says, "And I mean you read-told me what your rights were without even looking at that form, you knew your rights, is that correct?" [The Petitioner] says, "Yes."

> Mathis says, "And you have signed this rights waiver

-4-

agreeing to talk to us today." "Yes." "And that's your signature that I'm pointing to on this rights form." [The Petitioner] says, "Yes."

It's incredible to believe that the rights waiver got signed after the taped statement when they discuss it prior to even questioning on the tape, so that's totally unbelievable.

. . . .

Now, I don't believe that [the Petitioner] walked in there, signed the waiver, and started this. I think he had probably been there a while. He probably got there before midnight and had been talking to some of them and talking to them about things and as they decided they had information they needed to use, they read him [the] rights waiver and did the tape. There is really nothing wrong with it. He made a knowing and voluntary statement to the police. It was not made during the course of negotiations or settlement of this case. He obviously wanted good treatment and was looking out for himself, no doubt about that, that happens all the time. There was nothing improper about this. The motion to suppress the confession is overruled.

*Schreane*, 2006 WL 891394, at *1-3.

The Petitioner appealed his conviction to this Court, contending that the trial court erred when it failed to grant his motion to suppress his confession. He asserted that the State violated his Fifth Amendment rights by failing to obtain a waiver of those rights from him before he made incriminating statements to police. On that issue, we held:

The record reflects that the [Petitioner] initiated the questioning in this case by voluntarily seeking out the detectives and speaking to them concerning the victim's murder. In this regard, we conclude the record does not reflect that the [Petitioner] was under custodial interrogation before the police read him the *Miranda* warnings and obtained his waiver of rights. The [Petitioner] is not entitled to relief on this issue.

*Schreane*, 2006 WL 891394, at *5.

The Petitioner also appealed the trial court's denial of his motion to suppress based

upon his allegation that his confession was involuntary in that it was the product of promises of leniency. With regard to that issue, we held:

> The record reflects that the trial court based its findings on the testimony of Det. Mathis and the [Petitioner's] statement and indicated it found the [Petitioner's] testimony incredible, at least to the extent it differed from Det. Mathis' testimony. Detective Mathis testified that he only promised the [Petitioner] to help him with the district attorney's office by telling them that the [Petitioner] had cooperated. We conclude Det. Mathis' promise was not improper.

*Id.* at * 5. The Petitioner appealed our holding to the Tennessee Supreme Court, which denied his request for an appeal. *Id.* at *1.

## B. Post-Conviction Petition

The Petitioner filed a petition for post-conviction relief in which he alleged that he received the ineffective assistance of counsel at trial. He contended his trial counsel was ineffective for: (1) not seeking dismissal of the Petitioner's indictment on due process grounds; (2) not seeking dismissal of the Petitioner's indictment under the Interstate Compact on Detainers; and (3) not seeking suppression of the Petitioner's statement to police on the basis that he was denied the right to counsel.

The post-conviction court dismissed the Petitioner's post-conviction petition, and the Petitioner appealed that dismissal to this Court. In our opinion affirming the post-conviction court's judgment, we summarized the facts presented in the Petitioner's direct appeal and also the facts presented at the post-conviction hearing. As relevant to this appeal, our opinion held:

> This [C]ourt previously concluded that "the record does not reflect that the [Petitioner] was under custodial interrogation before the police read him the *Miranda* warnings and obtained his waiver of rights." The record reflects that the Petitioner initiated the questioning in this case by voluntarily seeking out the detectives and speaking to them concerning the victim's murder. As a result, the Petitioner was not subject to custodial interrogation when he initiated communication with the detectives. *See* [*State v. Land*, 34 S.W.3d 516, 524 (Tenn. Crim. App. 2000)]. The Petitioner testified that he requested counsel at the beginning of his conversation with the detectives, before any custodial interrogation began. Absent custodial interrogation, however, the Petitioner's right to counsel was not infringed. *See* [*Edwards v. Arizona*, 451 U.S. 477,

-6-

485-86 (1981); *State v. Huskey*, 177 S.W.3d 868, 881 (Tenn. Crim. App. 2005)]. Additionally, any statement the Petitioner made during subsequent custodial interrogation did not violate his right to counsel because he waived that right before any custodial interrogation began. As a result, the Petitioner's right to counsel was not violated when he spoke to the detectives.

*Schreane*, 2010 WL 3919264, at *8-9 (some citations omitted). The Petitioner appealed our decision to the Tennessee Supreme Court, which denied him permission to appeal. *Id.* at *1.

## C. Writ of Error Coram Nobis

On May 12, 2010, before our opinion on the Petitioner's appeal from the denial of his petition for post-conviction relief was released, the Petitioner filed a petition for writ of error coram nobis. In it, he again contended that he was "in custody" at the time that he gave incriminating statements about the murder. He stated in the petition that he invoked his right to counsel and that his statement was involuntary. The Petitioner further asserted that the State committed a violation of *Brady v. Maryland*. He argues that, on November 10, 2010, he received his case from his appeal and was "unable to review the enclosed (8) eight legal tapes," only three of which included his interview. He states that these tapes, which may include some statements by other persons, are "[n]ewly discovered evidence."

## II. Analysis

On appeal, the Petitioner contends that the coram nobis court erred when it dismissed his petition for a writ of error coram nobis because his statement was made while in "custody" and without the benefit of *Miranda* warnings. He further contends that the tapes are "newly discovered evidence." The State counters first that the Petitioner's writ was filed "well beyond" the one-year statute of limitations and should be dismissed. The State further asserts that the Petitioner has failed to prove that he is entitled to a new trial based upon "newly discovered evidence."

When it dismissed the Petitioner's petition, the coram nobis court found:

Even if the suppression of the [P]etitioner's statement to police has judgment-affecting potential, the newly discovered recordings do not necessitate the suppression of the statement. At the same time that the subject motion alleges a *Brady* violation and newly discovered recordings, it contradictorily alleges that the recordings were discovered in appellate counsel's file. Nor does the motion clearly allege that the newly discovered recordings corroborate the [P]etitioner's account of police promises and

-7-

representations to him at the time of his statement, only that one of the suspects describes two perpetrators. It seems unlikely that, during interviews of other suspects, police would refer to any promises to the [P]etitioner. It seems especially unlikely that, during the interviews of other suspects that, presumably, predate the [P]etitioner's statement, police would refer to any future promises to the [P]etitioner.

The Court therefore interprets the subject motion as alleging that the recordings newly discovered by the [P]etitioner, though not necessarily newly disclosed to the defense, establish that, at the time of his statement and despite representations to him to the contrary, police were actually looking for a second perpetrator. Such an allegation, however, is not equivalent to an allegation that recordings not disclosed to the defense before trial corroborate the [P]etitioner's account of police representations and promises to him at the time of his statement and establish that the statement was involuntary and does not state a claim for the writ of error *coram nobis*.

The coram nobis court went on to state in its order dismissing the writ that:

In any event, even did the recordings of the interrogations of other suspects constitute new evidence, had they been presented at trial, whatever they contain, they could not have cast so much doubt on the [Petitioner's] confession as to result in a different judgment. They did not lead to an immediate arrest, and, at a time, when by the [P]etitioner's own account, the victim's murder was years old and "cold", the [P]etitioner initiated the questioning . . . by voluntarily seeking out the detectives and speaking to them concerning the victim's murder.

(Citation omitted).

A writ of error coram nobis is available to a defendant in a criminal prosecution. T.C.A. § 40-26-105(a) (2012). The decision to grant or to deny a petition for the writ of error coram nobis on its merits rests within the sound discretion of the trial court. *State v. Ricky Harris*, 301 S.W.3d 141, 144 (Tenn. 2010) (citing *State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007)). Tennessee Code Annotated section 40-26-105(b) provides, in pertinent part:

Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have

resulted in a different judgment, had it been presented at the trial.

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999); *State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002). As previously noted by our Court, "the purpose of this remedy 'is to bring to the attention of the [trial] court some fact unknown to the court, which if known would have resulted in a different judgment.'" *State v. Hart*, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995) (quoting *State ex rel. Carlson v. State*, 407 S.W.2d 165, 167 (Tenn. 1996)).

To establish that he is entitled to a new trial, the Petitioner must show: (a) the grounds and the nature of the newly discovered evidence, (b) why the admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial, (c) that the Petitioner was without fault in failing to present the newly discovered evidence at the appropriate time, and (d) the relief sought. *Hart*, 911 S.W.2d at 374-75. Affidavits should be filed in support of the petition. *Id.* at 375.

> The grounds for seeking a petition for writ of error coram nobis are not limited to specific categories, as are the grounds for reopening a post-conviction petition. Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner also establishes that the petitioner was "without fault" in failing to present the evidence at the proper time. Coram nobis claims therefore are singularly fact-intensive. Unlike motions to reopen, coram nobis claims are not easily resolved on the face of the petition and often require a hearing.

*Harris v. State*, 102 S.W.3d 587, 592-93 (Tenn. 2003). Similar to habeas corpus hearings, coram nobis evidentiary hearings are not mandated by statute in every case. *Richard Hale Austin v. State*, No. W2005-02591-CCA-R3-CO, 2006 WL 3626332, *6 (Tenn. Crim. App., Jackson, Dec. 13, 2006). A petition of either type "'may be dismissed without a hearing, and without the appointment of counsel for a hearing'" if the petition does not allege facts showing that the petitioner is entitled to relief. *Id.* (quoting *State ex rel. Edmondson v. Henderson*, 421 S.W.2d 635, 636 (Tenn. 1967)).

Coram nobis claims are subject to a one-year statute of limitations that is computed from the date the judgment of the trial court becomes final. T.C.A. § 27-7-103 (2009); *State v. Mixon*, 983 S.W.2d 661, 670 (Tenn. 1999). The State bears the burden of raising the bar of the statute of limitations as an affirmative defense. *Harris*, 102 S.W.3d at 593. Due process considerations may toll the statute of limitations applicable to coram nobis petitions. *Workman v. State*, 41 S.W.3d 100, 101 (Tenn. 2001). To determine whether due process

-9-

requires tolling, a court must weigh the petitioner's interest in obtaining a hearing to present a later-arising ground for relief against the State's interest in preventing stale and groundless claims. *Id.* at 103. In balancing these interests, a court should utilize a three-step analysis:

> (1) determine when the limitations period would normally have begun to run;
>
> (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and
>
> (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

*Sands v. State*, 903 S.W.2d 297, 301 (Tenn. 1995). Whether due process requires tolling of the limitations period is a mixed question of law and fact, which this Court reviews de novo with no presumption of correctness. *See Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006).

In this case, the State contends that the Petitioner's writ is time barred. The Petitioner was tried and convicted in 2004.[1] This Court affirmed his judgments on April 5, 2006, and the Tennessee Supreme Court denied the Petitioner permission to appeal on August 28, 2006. The Petitioner filed his writ of error coram nobis on May 12, 2010, which is well beyond the one-year statute of limitations. As the coram nobis court noted, however, the Petitioner's claims are that the State failed to disclose evidence to him in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *Brady* claims can, in rare cases, be considered "newly discovered evidence" in a petition for a writ of error coram nobis. *Antonio Bonds v. State*, No. W2006-00343-CCA-R3-CO, 2006 WL 3516225, at *4 (Tenn. Crim. App., at Jackson, Dec. 6, 2006), *perm. app. denied* (Tenn. Apr. 16, 2007) (citing *Freshwater v. State*, 160 S.W.3d 548 (Tenn. Crim. App. 2004). When appropriate, this Court has tolled the statute of limitations for a petition for a writ of error coram nobis on due process grounds. *State v. Ratliff*, 71 S.W.3d 291 (Tenn. Crim. App. 2001). In the case under submission, the coram nobis court correctly recognized that the statute of limitations is sometimes properly tolled for a writ of error coram nobis that alleges a *Brady* violation. We will, therefore, review the merits of the issue presented by the Petitioner.

The Petitioner contends that the tapes that he received as part of the record from his appellate counsel contain evidence that would support his claim that the confession that he gave to police was not voluntary. Those tapes contained recordings of suspects in the 1991

---

[1]The Petitioner's judgments of conviction are not included in the record, and the record does not evince the precise date of the entry of those judgments.

murder that were interviewed by police before the case became "cold." The Petitioner did not in his petition, and does not on appeal, explain why these tapes show that his confession was involuntary. Further, as the coram nobis court noted, these tapes are unlikely to contain information relevant to the Petitioner's claim that police promised the Petitioner, who was not a suspect at the time, favorable treatment if he confessed to the crime. We conclude that the tapes of other suspects do not constitute "newly discovered evidence" and, as such, are not the proper subject for a writ of error coram nobis. The Petitioner is not entitled to relief.

## II. Conclusion

After a thorough review of the record and the applicable law, we affirm the coram nobis court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE